*********** *Page 2 
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for some modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Deluca with minor modifications. ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. An accident resulting in the death of Elmer Arguetta occurred on April 4, 2007, at 475 Holiday Road, Horseshoe, North Carolina 28742.
2. The parties have been properly designated and there is no question as to joinder or non-joinder of parties.
3. The parties stipulated to a pre-trial agreement as stipulated exhibit 1 and to a set of materials encompassing 144 pages as stipulated exhibit 2.
4. Pursuant to agreement during the hearing before the Deputy Commissioner, the parties stipulated that plaintiff's average weekly wage was $601.87, producing a compensation rate of $401.45.
5. Issues for resolution before the Commission are whether decedent was an independent contractor, an employee of Mike Kilpatrick, or an employee of Trade Pro; and, if decedent sustained a compensable injury resulting in his death, who should receive death benefits and in what amount.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. In December 2005, Mike Kilpatrick and his wife, Rhonda Kilpatrick, purchased land in Horseshoe, North Carolina. They later obtained a permit to build a home on the land. *Page 3 
Prior to the accident which is the subject of this claim, Mike Kilpatrick, through his business, Trade Pro, performed electrical work on the home.
2. Trade Pro is a sole proprietorship limited liability company that specializes in construction staffing and electrical contracting. Mr. Kilpatrick started this business in 2003. As of 2007, Trade Pro continued to operate as a sole proprietorship limited liability company. Mr. Kilpatrick had authority over the company bank accounts and also did the payroll. Mr. Kilpatrick and his wife, Rhonda, were the only persons authorized to write checks on Trade Pro accounts and were the only persons who profited from the company. In March 2007, Mr. Kilpatrick changed the name of Trade Pro to Carolina Contractors Construction Group.
3. With respect to his home, Mr. Kilpatrick operated as the general contractor on the home and performed much of the work himself. He hired other individuals to perform specialty work that he was unable or too busy to perform.
4. Depending on the nature of the work being performed at the time, Mr. Kilpatrick was able to pull various building permits. However, sometimes the building permit requirements of Transylvania County required that a licensed contractor pull the permit. One of those times was the electrical portion of construction. Even though electrical contracting was his specialty, Mr. Kilpatrick's electrical license is through Trade Pro. Consequently, he had to pull the electrical permit for his home through his business, Trade Pro, to satisfy the permit requirements of Transylvania County.
5. Mr. Kilpatrick testified that if his electrical license were through himself as an individual, rather than through his company, Trade Pro's name would not be on any of the building permits. Mr. Kilpatrick performed most of the electrical work on his home and also *Page 4 
utilized some Trade Pro employees, John Fuge and his assistant Victor, to perform electrical work on the home.
6. Mr. Kilpatrick first met decedent in the fall of 2006 through his cousin, Bill Kilpatrick, who is a remodeling contractor. At that time, decedent was working for Bill Kilpatrick. However, when Bill Kilpatrick's business started slowing down, decedent and another one of Bill Kilpatrick's employees, Cymon Bowser, asked Mike Kilpatrick if he needed any work done on his home until Bill Kilpatrick's business picked up again.
7. Decedent and Mr. Bowser were hired in February 2007 to assist with the construction of Mike Kilpatrick's home. They were hired to perform carpentry work, including framing, installing windows and doors, installing siding and roofing. Decedent was not engaged in an independent business or occupation at this time. Decedent began performing interior framing at the house. During the months of March and April 2007, decedent switched from performing interior framing to performing roofing and soffit work on the home.
8. Some Trade-Pro employees performed tasks at Mr. Kilpatrick's home in February and March of 2007 and during several other periods of the home's construction. Trade Pro employees John Fuge and Victor were paid with paychecks from Trade-Pro. Hours were kept for all workers, including John Fuge, Victor, and decedent, at the house during the week of March 9, 2007, on a Trade-Pro timesheet.
9. Decedent was assigned tasks and duties for the day or week during morning meetings with Mr. Kilpatrick regarding tasks to be accomplished. Sometimes Mr. Kilpatrick would stay and work on the house, and sometimes he would leave to work on other projects. The Full Commission finds that significant control was exercised over the work that decedent did on Mr. Kilpatrick's home. *Page 5 
10. Decedent was expected to present himself to the home virtually every day of the workweek to complete the various tasks to which he was assigned, and he regularly did so throughout the month of March 2007.
11. Decedent was compensated for his work at the home on an hourly basis of $15.00 an hour, plus time-and-a-half for any work over 40 hours in one week. Decedent was paid for his work at the house with a Trade-Pro paycheck dated February 9, 2007, in the amount of $585.00. Decedent received another paycheck from Trade-Pro for work at the house on February 16, 2007, in the amount of $600.00. On March 9, 2007, decedent received a paycheck from Mike and Rhonda Kilpatrick personally in the amount of $622.50 for work at the house. Decedent received a paycheck from Carolina Contractors Construction Group's payroll account on March 19, 2007, in the amount of $600.00, for his work at the house.
12. Mr. Kilpatrick paid decedent out of convenience and based on which checkbook was on hand. Mr. Kilpatrick testified that this method of business was "sloppy transactions" on his part, but he treated Trade Pro and his personal checking as the same, as Trade Pro was his business, and he "took the path of least resistance and the most convenience." If his wife was out of town with the payroll check or their personal checkbook and the Trade Pro funds were the most accessible, he would access those and pay whoever he needed to pay. If he took funds from Trade Pro to pay for work on his personal home, he never paid Trade Pro back, as he considered "Trade Pro money" to be the same as "Mike Kilpatrick's money."
13. Mr. Kilpatrick stated that he planned to claim the sum of payments made to decedent by Trade-Pro as "miscellaneous business expense" on Trade-Pro's taxes.
14. Neither Mike nor Rhonda Kilpatrick ever paid Trade-Pro anything for the services it provided to the home. *Page 6 
15. Decedent never provided a certificate of insurance to Trade Pro or Mike Kilpatrick.
16. Mike Kilpatrick testified that, in his mind, he differentiated decedent from other workers in terms of the employment relationship.
17. Decedent and Mr. Bowser were required to bring their own tools, although Mr. Kilpatrick supplied the building supplies.
18. Mr. Kilpatrick had decedent and Mr. Bowser sign a Work for Hire Agreement on March 5, 2007. That Agreement provides, in pertinent part, that: decedent was to be paid on an hourly basis at the rate of $15.00 per hour and $22.50 per hour for overtime; that decedent was an independent contractor who is not entitled to insurance, vacation or any other employee benefit; that decedent acknowledged his obligation to obtain insurance coverage and waives any right to recovery from Mr. Kilpatrick for any injuries; and that decedent agreed to indemnify and hold harmless Mr. Kilpatrick. He did not have them complete a 1099 nor did he obtain their Social Security numbers. No W-2 or 1099 was ever issued to decedent.
19. Mr. Kilpatrick testified that a week before the accident, decedent and Mr. Bowser needed to work on the soffits, overhangs, and fascia boards on the outside of the second story. Mr. Kilpatrick discussed the best way to perform this work with decedent and Mr. Bowser, and they stated that they needed a lift. Mr. Kilpatrick agreed, as he thought it was probably the safest way to accomplish this work.
20. Mr. Kilpatrick rented a man lift from United Rentals on his Trade Pro account. He testified that it was sloppy business to rent this equipment that he needed for the building of his private home on his business account, but it was easy and convenient. He also paid for the *Page 7 
man lift with his Trade Pro charge card. Mr. Kilpatrick testified that it probably was not the best idea but, again, it was easy and convenient.
21. When United Rentals delivered the lift, Mr. Kilpatrick, decedent and Mr. Bowser were given a brief overview and safety orientation by an employee of United Rentals. Both decedent and Mr. Bowser used the lift along with Mr. Kilpatrick.
22. On April 4, 2007, Mr. Kilpatrick met decedent and Mr. Bowser at the job site. They discussed finishing some porch work that day, using the lift to carry up some roofing shingles and installing the soffit and fascia boards on the second floor of the home.
23. Later that day, the boom on the man lift overturned and decedent and Mr. Bowser were thrown out of the bucket. Both men were killed instantly.
24. At the time of his death, decedent was survived by his wife, Nidia Guardado, to whom he was married on February 1, 1999; his minor son Genesis Antonio Argueta-Guardado, born December 25, 1998; his minor son Elmer Elias Argueta, born October 11, 2000; and his minor daughter Yaleska Dayanara Argueta, born May 27, 2006.
25. In addition to the natural children of decedent and his wife, Nidia Guardado, decedent's wife had one child, Joel Alfredo Maldonado, born October 18, 1994, from a previous marriage whom decedent never adopted, but who he nonetheless accepted as his own. The biological father of Joel Alfredo Maldonado returned to Mexico and never paid child support. Decedent provided the entire financial support for Joel Alfredo Maldonado.
26. Decedent also fathered a child outside of wedlock with Melissa D. Adams, named William Adams, born February 23, 2003. Decedent acknowledged this child as his own and provided child support for William Adams in the amount of $283.00 per month. *Page 8 
27. Decedent was not survived by any other person that was either wholly or partially dependent upon him for their support.
28. Nidia Guardado is presently disabled due to breast and brain cancer and has received Social Security disability benefits since February 2007.
29. Decedent's heirs spent $11,870.00 in funeral expenses for the burial of decedent.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. An injured person is entitled to workers' compensation benefits under the North Carolina Workers' Compensation Act only if he is an employee of the party from whom compensation is sought. Barber v. GoingWest Transp., Inc., 134 N.C. App. 428, 517 S.E.2d 914 (1999); Williamsv. ARL, Inc., 133 N.C. App. 625, 516 S.E.2d 187 (1999).
2. In the case at bar, the contract between Trade Pro and decedent provided that decedent was an independent contractor. However, the actual relationship between the parties is determinative, not how the parties may have designated their relationship. Youngblood v. North State FordTruck Sales, 321 N.C. 380, 364 S.E.2d 433 (1988); Williams v. ARL, Inc.,supra. In Hayes v. Elon College, 224 N.C. 11, 29 S.E.2d 137 (1944), the North Carolina Supreme Court held that the dominant indicator in the determination of whether a worker is an independent contractor or an employee is whether the employer has authority to control how the worker accomplishes the tasks to be completed. Id. The Court stated that while no one factor is controlling and the presence of all factors is not required, the eight factors to be considered when deciding the degree of control exercised by an employer in each situation include whether: *Page 9 
 The person employed (a) is engaged in an independent business, calling or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time. Id. at 16, 29 S.E.2d at 140.
3. Applying the Hayes analysis to the facts in this case, Trade Pro exercised sufficient control over the way decedent accomplished the work tasks to be completed such that an employment relationship was established. Decedent did not have an independent carpentry business. He was supervised by Mr. Kilpatrick, who arranged morning meetings and decided what work would be completed on a specific day. Decedent did not select his own work time, as he was expected to be present for the morning meetings. Decedent was paid by the hour, and not for a contract price. Hayes v. Elon College, supra.; Durham v. McLamb, 59 N.C. App. 165,296 S.E.2d 5 (1982). Decedent was not free to hire his own assistants or control them. That decedent was skilled in carpentry such that he required little supervision did not make him an independent contractor.Lloyd v. Jenkins Context Co., 46 N.C. App. 817, 819, 266 S.E.2d 35, 37
(1980). Further, the nature and goal of decedent's actions at the time of his injury were reasonably related to his employment. Hoffman v. TruckLines, 306 N.C. 502, 293 S.E.2d 807 (1982). Therefore, at the time of his death, decedent was an employee of defendant-employer Trade-Pro. N.C. Gen. Stat. § 97-2(2).
4. On April 4, 2007, decedent sustained an injury by accident, resulting in his death, arising out of and in the course of his employment with defendants. N.C. Gen. Stat. § 97-2(6).
5. Plaintiffs are entitled to the payment of any medical expenses incurred for decedent's injuries sustained as a result of the injury by accident. N.C. Gen. Stat. § 97-25. *Page 10 
6. Nidia Guardado, Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, Yaleska Dayanara Argueta, Joel Alfredo Maldonado, and William Adams were wholly dependent upon decedent at the time of his death and are therefore entitled to the death benefits, share and share alike. N.C. Gen. Stat. §§ 97-38, 97-39. Decedent did not leave any other persons who were either wholly or partially dependent upon decedent for support. Therefore, Nidia Guardado, Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, Yaleska Dayanara Argueta, Joel Alfredo Maldonado, and William Adams are the only persons entitled to take the death benefits in this matter. Nidia Guardado is the mother and natural guardian of the four minor children, Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, and Yaleska Dayanara Argueta and Joel Alfredo Maldonado. Melissa D. Adams is the mother and natural guardian of William Adams.
7. Decedent's average weekly wage at the time of the injury by accident was $601.87, which yields a weekly compensation rate of $401.45. N.C. Gen. Stat. § 97-2(5).
8. Nidia Guardado is entitled to receive one-sixth of the death benefits at the rate of $66.91 per week beginning April 4, 2007, and continuing during her lifetime or until remarriage. N.C. Gen. Stat. § 97-38. The minor children, Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, Yaleska Dayanara Argueta, Joel Alfredo Maldonado, and William Adams are each entitled to receive one-sixth of the death benefits in the amount of $66.91 per week for 400 weeks beginning April 4, 2007, or until each child reaches the age of 18, whichever occurs last. N.C. Gen. Stat. § 97-38.
9. Defendants shall pay said benefits to Nidia Guardado, the mother and natural guardian of the minor children, for the use and maintenance of Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, Yaleska Dayanara Argueta, and Joel Alfredo Maldonado. *Page 11 
10. Defendants shall pay said benefits to Melissa D. Adams, the mother and natural guardian of William Adams, for the use and maintenance of said minor child.
11. Defendants shall pay funeral expenses not to exceed $3,500.00 to the appropriate party who provided or previously paid for such services. N.C. Gen. Stat. § 97-40.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to decedent's widow, Nidia Guardado, her pro-rata share of decedent's compensation rate, $66.91 per week, beginning April 4, 2007, for the remainder of her lifetime or until she remarries, subject to the attorney's fee provided below. The amount of said compensation which has already accrued shall be paid in a lump sum.
2. Defendants shall pay to Nidia Guardado, the mother and natural guardian of the minor children, Genesis Antonio Argueta-Guardado, Elmer Elias Argueta, Yaleska Dayanara Argueta, and Joel Alfredo Maldonado, for the use, benefit, and maintenance of said minor children, compensation in the amount of $66.91 per week for each minor child beginning April 4, 2007, for 400 weeks or until the age of 18 years, *Page 12 
whichever comes last, subject to the attorney's fee provided below. The amount of said compensation which has already accrued shall be paid in a lump sum.
3. Defendants shall pay to Melissa D. Adams, the mother and natural guardian of William Adams, for the use, benefit and maintenance of said minor child, compensation in the amount of $66.91 per week beginning April 4, 2007, for 400 weeks or until the age of 18 years, whichever comes last, subject to the attorney's fee provided below. The amount of said compensation which has already accrued shall be paid in a lump sum.
4. Defendants shall pay any medical expenses incurred as a result of the injuries sustained by decedent as a result of the injury by accident. N.C. Gen. Stat. § 97-25.
5. Defendants shall pay burial expenses in the amount of $3,500.00 to the person(s) entitled to reimbursement.
6. Defendants shall pay to plaintiffs' counsel an attorney's fee in the amount of 25% of the death benefits. Fees based upon compensation that has accrued shall be paid to plaintiffs' counsel in a lump sum; thereafter, plaintiffs' counsel shall receive every fourth compensation payment that is due plaintiffs.
7. Defendants shall bear the costs.
This 20th day of February 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER